Rel: April 11, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2025-0003

_____

**Rayonier Forest Resources, LP**

v.

**Ronnie Hudson and Dwight Hudson**

**Appeal from Crenshaw Circuit Court**
**(CV-22-900031)**

HANSON, Judge.

Rayonier Forest Resources, LP ("Rayonier"), appeals from a judgment entered by the Crenshaw Circuit Court ("the trial court") establishing a boundary line between property owned by Rayonier and property owned by Ronnie Hudson and Dwight Hudson ("the Hudsons"). We reverse the judgment and remand the case with instructions.

Background

Rayonier and the Hudsons own adjoining parcels of property in Crenshaw County. On August 2, 2022, the Hudsons commenced a civil action by filing a complaint against Rayonier pursuant to Ala. Code 1975, § 35-3-1 et seq., to establish the boundary line between the properties and to obtain damages for the alleged unlawful cutting of timber on their property. On September 9, 2022, Rayonier filed an answer denying the material allegations of the complaint, along with a counterclaim to establish the boundary line between the properties. The Hudsons claimed that the boundary line should be as established in the Hudsons' deed to their property and as mapped by a 2022 survey performed by Zachary Bradley; Rayonier, on the other hand, claimed that it had adversely possessed a part of the Hudsons' property and that the boundary line should be farther west of the property line described in the Hudsons' deed.

On October 24, 2023, the trial court conducted a bench trial at which Bradley, the Hudsons, and Phillip Smith, a representative of Rayonier, testified. The trial court also admitted numerous exhibits depicting and relating to the properties. Although the trial court was

invited to inspect the properties, the record does not indicate that the judge viewed the properties in person. On November 20, 2023, the trial court entered a judgment establishing the boundary line between the properties and denying the Hudsons' claim for damages for the unlawful cutting of timber. In the judgment, the trial court determined that Rayonier had obtained only a part of the Hudsons' property through adverse possession.

Rayonier filed a timely postjudgment motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial. In the motion, Rayonier, among other things, argued that the trial court had erred in determining that Rayonier had not adversely possessed the entire part of the Hudsons' property that it had claimed. On February 7, 2024, the trial court amended the judgment to redefine the boundary line, but it otherwise maintained that Rayonier had not adversely possessed all of the Hudsons' property that it had claimed. On March 18, 2024, Rayonier timely appealed to the Alabama Supreme Court, which, after granting leave to the Alabama Forestry Association to file an amicus curiae brief, transferred the case to this court on December 31, 2024.

Issue

3

In its brief, Rayonier frames the issue as follows:

"Did the trial court improperly apply a standard for proving adverse possession that was inconsistent with the rule that acts of possession or control need be only those consistent with the character of the land?"

The Hudsons have not favored this court with a responsive brief, so we will review the case based on the question posed by Rayonier.

## Standard of Review

Rayonier raises a question of law as to whether the trial court applied the appropriate standard to the undisputed facts when determining whether Rayonier had adversely possessed the disputed property. We review questions of law de novo. Corriveau v. Whitcomb, 366 So. 3d 975, 978 (Ala. Civ. App. 2022).

## The Evidence

Ronnie Hudson testified that his parents acquired approximately 120 acres of undeveloped land in southern Crenshaw County ("the Hudson property") through two transactions -- one in 1956 and another in 1976. According to Ronnie, after his father died in 2005, the Hudson property passed to his mother, who, in 2011, transferred it to him and Dwight. Ronnie recalled that an ancient fence line ran diagonally from

4

the northern boundary of the Hudson property to the southeast, but, he said, that fence line was not considered the property line. Ronnie said that his father had pointed out to him the northeastern boundary of the Hudson property, which, he said, was located east of the ancient fence line. Ronnie testified that the property line had never been surveyed and that "[w]e always thought we had a really good deed."

According to Ronnie, for many years, the Hudson family used their land for farming, raising cattle, and cultivating timber. The Hudson property was bound to the east by undeveloped land owned by the Williamson family. The Hudson family leased land from the Williamsons and used it to expand their farming operations; however, at some point in the 1970s, the Williamson family sold their property to the Container Corporation, and the Hudson family discontinued their farming operations. The Hudson family continued to raise cattle on their property for a period, but they eventually stopped that operation before 2000. Afterward, they used the Hudson property as timberland and regularly leased the property for hunting purposes. Ronnie and Dwight testified that they had rarely visited the property in the 2000s.

After the Container Corporation acquired the old Williamson property, it planted and harvested pine trees. That property then passed to Jefferson Smurfit, who, in 1999, sold it to Rayonier, which has since owned the property ("the Rayonier property") and managed it as timberland. Rayonier also leased the land to hunters. Rayonier did not obtain a survey of the Rayonier property before acquiring it. Smith testified that, based on standard forestry-management practices, Rayonier had determined its property boundaries by reference to existing paint markings on the trees on the property. Smith testified that Rayonier's predecessors in title had marked the trees on the western boundary of the Rayonier property with orange paint. Rayonier applied blue paint to the same trees to signify its ownership of the trees and hung signs approximately every 300 feet declaring the tree line as the boundary of the Rayonier property. Smith said that every five to seven years, Rayonier would freshly paint the trees. Smith stated that the painted tree line constituted the western boundary of the Rayonier property.

According to Smith, Rayonier inherited a painted tree line that encroached into the Hudson property. The painted tree line ran from a

6

point on the northeastern boundary of the Hudson property in a southeasterly direction, following the ancient fence line that Ronnie described in his testimony. At the point the ancient fence line terminated, the painted tree line extended diagonally toward the southeastern corner of the Hudson property. Smith testified that, when Rayonier acquired the property in 1999, part of a 12-year-old planted-pine plantation that it had purchased extended west to the ancient fence line. The planted-pine plantation also extended south to the terminal point of the ancient fence line. At that point, the land sloped downward, and the property was covered with hardwood trees and wetlands that were not conducive to pine-tree planting. Rayonier nevertheless marked the trees throughout that area that already had orange paint on them and treated the trees as the western boundary of its property.

Smith testified that Rayonier managed the Rayonier property to the painted tree line according to standard forestry-management practices. Rayonier harvested the pine trees in the existing pine plantation in late 2012 or early 2013 and replanted pine seedlings on that property in late 2013 or early 2014. Smith testified that Rayonier had harvested trees as far south as was feasible, but that it had not cut any

7

trees in the area south of the terminal point of the ancient fence line. Smith explained that the area was normally too wet for ordinary harvesting operations and that it would take special equipment to cut the hardwoods. Smith also testified that, if there was a stream in that area, the best forestry-management practices required Rayonier to maintain a 35-foot buffer zone on either side of the stream. After viewing the area, Smith determined that there was not a sufficient volume or magnitude of hardwood trees in the area to justify harvesting there. Smith admitted that the paint on the trees was the only sign that Rayonier was occupying the area south of the ancient fence line.

In 2022, the Hudsons decided to sell the Hudson property to their western neighbor, who requested a survey to settle the eastern boundary of the property. According to Ronnie, at that time, the Hudsons realized that Rayonier may be claiming ownership to a portion of their property because some of the trees on their property had Rayonier boundary-line signs attached to them. Ronnie and Dwight testified that they had never agreed to allow Rayonier or its predecessors in title to use their property as part of their timbering operations or to mark the trees on their property. Ronnie testified that he had walked the land and had observed

the paint markings and signs, which Smith testified were easily visible.

Ronnie testified as follows:

> "[Rayonier's Counsel]: And would it be fair to say that these signs and this paint appears all up and down the lines that we're talking about on the north side of your property and on the east side of your property?
>
> "[Ronnie]: Yeah, they're up and down. Yeah. They're there.
>
> "[Rayonier's Counsel]: They're there. They're there. And are you acquainted with any other timber companies in the area and whether or not they paint their lines?
>
> "[Ronnie]: Yes. A few.
>
> "[Rayonier's Counsel]: And do they paint them to indicate where they claim their property lines are?
>
> "[Ronnie]: Well, I guess they use that. But I can't say that their property lines are exactly right either, you know?
>
> "[Rayonier's Counsel]: I understand that I just solely -- that would lead you to guess they're claiming at that point; is that right?
>
> "[Ronnie]: Right.
>
> "[Rayonier's Counsel]: And wouldn't it be normal and common sense if somebody painted a line like that and put signs up and said this is their boundary line, that the paint is indicating where they're claiming the line is?
>
> "[Ronnie]: Well, yeah, where they claim the line is.

"[Rayonier's Counsel]: Yes, sir. I'm not asking you to give up your case. I'm just asking you, that's just in your being familiar with property and you own property and you understand people try to indicate where they own and where their lines are, right?

"[Ronnie]: Correct.

"[Rayonier's Counsel]: All right. Would ... it ... be fair to say that this is a fair indicator to third parties that Rayonier was claiming that to be their boundary line?

"[Ronnie]: I agree with that."

Zachary Bradley testified that, in 2022, he performed a survey to determine the Hudson property line. Bradley stated that he had used the property description in the Hudsons' deed to determine the boundary lines of the property. While performing the survey, Bradley observed a tree line marked with orange and blue paint commencing approximately 400 feet from the northeast corner of the Hudson property and running southeasterly to the southeastern property line of the Hudson property. The tree line coincided with the ancient fence line for the first 1,000 feet and then continued southeasterly from the terminal point of the ancient fence line for a considerable distance. Some of the trees contained a placard, stating "property boundary of Rayonier." Bradley testified as follows:

10

"[Rayonier's Counsel]: Okay. So, and is this consistent with the way the trees were marked? And in this case the one you're looking at has several different colors of paint on it. Is that consistent with the practice of timber companies in the area to paint their lines?

"[Bradley]: Yes, sir, it is.

"[Rayonier's Counsel]: Is that an indication of ownership? If you're a surveyor, in you're [sic] expert capacity, if you see something marked boundary line, does that indicate their [sic] claiming it as a boundary lane?

"[Bradley]: It's evidence, yes, sir.

"[Rayonier's Counsel]: Yes, sir I'm not asking you to make a conclusion. The [j]udge is here to straighten us out if we're wrong. But in your training as a surveyor, were you trained to show that this is an indication of a possible boundary claim?

"[Bradley]: Yes, sir.

"....

"[Rayonier's Counsel]: ... And again, to summarize, you were trained to observe painted trees and to note those if you were doing a boundary survey; is that correct?

"[Bradley]: Evidence of possession, yes, sir.

"[Rayonier's Counsel]: Yes, sir. And who told you it was evidence of possession? Is that a standard thing that you learned when you were studying surveying?

"[Bradley]: No, sir. I believe that to be common sense."

Bradley explained that he had documented the marked tree line in his survey as evidence of a "possible possession overlap," meaning that there could be another landowner asserting a possessory interest in the property.

The Trial Court's Findings of Fact and Conclusions of Law

In the final judgment, the trial court found that Rayonier had adversely possessed that part of the Hudson property extending to the terminal point of the ancient fence line because, in addition to marking the trees with paint, Rayonier had also harvested the pine trees in that area and had replanted pine seedlings for further timbering operations. As to the land below the terminal point of the ancient fence line, the trial court determined that Rayonier had only painted trees and placed a few signs on that area without conducting any harvesting or planting operations. The trial court concluded that the markings and signs alone were not sufficient to support a claim to ownership of the disputed property through adverse possession.

In reaching its determination, the trial court relied on the following conclusions of law:

"'If a coterminous landowner holds actual possession of the disputed strip under a claim of right openly and exclusively for a continuous period of ten years, believing that he is holding to the true line, he thereby acquires title up to that line, even though the belief as to the correct location originated in a mistake, and it is immaterial what he might or might not have claimed had he known he was mistaken.' Smith v. Brown, 282 Ala. 528, 213 So. 2d 374 (Ala. 1968).

"'If the land is woodland, there must ordinarily "be such a continuous and persistent cutting of timber or wood from the tract, as to be evidence of a claim of ownership, and an advertisement to the world that the party is occupying the entire tract" (Green v. Marlin, 219 Ala. 27, 121 So. 19, 22 [(1929)] and citations), or some other continuous acts of adverse possession.' [282 Ala. 536] ....' Smith v. Brown, 282 Ala. 528, 213 So. 2d 374 (Ala. 1968)."

The trial court concluded that Rayonier had not taken "the requisite action in [the disputed property] to comply with the requirement of showing adverse possession of woodland as stated in Smith v. Brown." The trial court expressed a concern that Rayonier could claim ownership based solely on "painted land lines," which, in its opinion, placed "an undue burden on landowners of large[,] wooded tracts." The trial court concluded that Alabama law requires an adverse owner of timber "to harvest and plant -- use the land in a way that anyone observing could see evidence of presumed ownership." Accordingly, the trial court held

13

that Rayonier had not met its burden of proving adverse possession of the southern tract of land.

Analysis

Alabama recognizes two types of adverse possession: (1) statutory adverse possession pursuant to Ala. Code 1975, § 6-5-200, and (2) adverse possession by prescription. Sparks v. Byrd, 562 So. 2d 211 (Ala. 1990). Boundary-line disputes "are subject to a unique set of requirements that is a hybrid of the elements of adverse possession by prescription and statutory adverse possession." Kerlin v. Tensaw Land & Timber Co., 390 So. 2d 616, 618 (Ala. 1980). However,

> "when a coterminous landowner is claiming to have acquired all or a significant portion of another coterminous landowner's land by virtue of adverse possession, (1) the case is an adverse-possession case rather than a boundary-line dispute, (2) the hybrid form of adverse possession does not apply, and (3), therefore, the party claiming adverse possession must prove the elements of either statutory adverse possession or prescriptive adverse possession."

Buckner v. Hosch, 987 So. 2d 1149, 1152 (Ala. Civ. App. 2007). In this case, Rayonier claimed that it had adversely possessed a substantial amount of acreage extending from the eastern border of the Hudson property, and it did not attempt to prove the elements of statutory

14

adverse possession established in § 6-5-200, so this case involves adverse possession by prescription. "Adverse possession by prescription requires actual, exclusive, open, notorious and hostile possession under a claim of right for a period of twenty years." Kerlin, 390 So. 2d at 618.

In a prescriptive adverse-possession case, the claimant must show the parts of the land actually possessed. See Lee v. Brown, 482 So. 2d 293, 296 (Ala. 1985). "'"Actual possession, or possession in fact, exists when the thing is in the immediate occupancy of the party ..." [and] is synonymous with pedis possessio.'" Childers v. Darby, 163 So. 3d 323, 328 (Ala. 2014) (quoting Southern Ry. Co. v. Hall, 145 Ala. 224, 226, 41 So. 135, 136 (1906), quoting in turn 28 American & English Ency. of Law 238 (2d ed.)). In this case, Rayonier claimed actual possession over the woodlands on the entire eastern border of the Hudson property. Rayonier presented undisputed evidence indicating that it had painted a tree line and had placed signs on the trees declaring its possession of the entire area to the east of that tree line. Rayonier further presented undisputed evidence indicating that it had managed the property within the tree line based on standard forestry-management practices. Smith testified, without contradiction, that Rayonier had harvested and planted pine

15

trees in the area from the northern part of the Hudson property as far south as feasible. Smith stated that Rayonier had not proceeded further south because it would not be practical to cut the hardwood trees due to the wet conditions of the land.

As noted, the trial court determined that Rayonier had adversely possessed only the northern part of that property, denying the claim of adverse possession as to the southern part of the property because Rayonier did not continuously and persistently harvest trees in that area. However, as will be explained, to prove actual possession of wild lands, Alabama law does not require an adverse possessor to regularly plant and harvest timber.

In Chastang v. Chastang, 141 Ala. 451, 459, 37 So. 799, 802 (1904), a landowner claimed to have adversely possessed the woodlands of a neighboring property based on evidence indicating that her father had often cut timber on that property; however, the landowner presented testimony from several witnesses who said that the cutting had only occurred at various, undefined locations on the property and at irregular intervals. In determining that that evidence was too indefinite to establish the boundaries of the property claimed, the supreme court said:

16

"It is true that there may be such a continuous and persistent cutting of timber or wood from a tract of land as to be evidence of a claim of ownership, and an advertisement to the world that the party is occupying the entire tract; and, if he is doing it in such a way and under such circumstances as to show to the world that he is claiming it as his right, it will ripen into title by adverse possession or prescription. But we hold that, without paper title, or some other evidence to define the boundaries of the land claimed, such acts of cutting timber as are detailed by the witnesses in this case are not sufficient to bar the legal title held by the defendant."

141 Ala. at 459, 37 So. at 802. Chastang did not hold that the landowner had to prove continuous and persistent cutting of timber or wood to obtain the neighboring woodlands by adverse possession. The supreme court held only that, under proper circumstances, such pervasive harvesting can alone be sufficient to prove adverse possession of an entire tract of land. Immediately following the above excerpt, the court explained that the cutting of timber is only evidence of one type of act of possession "to be taken into consideration with other evidence in determining the fact and the extent of adverse possession." 141 Ala. at 460, 37 So. at 802.

In Green v. Marlin, 219 Ala. 27, 31, 121 So. 19, 22 (1929), the supreme court, when discussing adverse possession of woodlands, stated:

17

" 'Occasional acts of entry upon land, and cutting timber therefrom, are not sufficient to show possession against the true owner, and would never ripen into adverse possession against the owner.' Williams v. Lyon, 181 Ala. 531, 61 So. 299 [(1913)].

"There must 'be such a continuous and persistent cutting of timber or wood from the tract, as to be evidence of a claim of ownership, and an advertisement to the world that the party is occupying the entire tract.' Chastang v. Chastang, 141 Ala. 451, 37 So. 799, 109 Am. St. Rep. 45 [(1904)]."

219 Ala. at 31, 121 So. at 22. Green perpetuated the holding in Chastang that, when a claimant relies solely on timber cutting to prove adverse possession, it must prove that the cutting is so continuous and persistent that it notifies the world that the timber cutter claims ownership of the entire tract of land. In Smith v. Cook, 220 Ala. 338, 341, 124 So. 898, 900 (1929), the supreme court clarified the law by saying:

"If the land is woodland, there must ordinarily 'be such a continuous and persistent cutting of timber or wood from the tract, as to be evidence of a claim of ownership, and an advertisement to the world that the party is occupying the entire tract' (Green v. Marlin, 219 Ala. 27, 121 So. 19, 22, and citations), or some other continuous acts of adverse possession (Montgomery v. Spears, 218 Ala. 160, 117 So. 753 [(1928)])."

(Emphasis added.) In Smith v. Brown, 282 Ala. 528, 213 So. 2d 374 (1968), upon which the trial court relied, the supreme court quoted Cook at length, but not for the purposes of expounding on the law relating to

18

adverse possession of woodlands. Brown concerned adverse possession by the erection of a fence in a boundary-line dispute between coterminous landowners.

Alabama law has always maintained that there are many acts that are indicative of possession and the claim of ownership and that "[t]he possession must be by acts suitable to the character of the land." Bell v. Denson, 56 Ala. 444, 449 (1876). In prescription cases, "the kind of possession [necessary to sustain a claim] is determined by the condition of the land, not with reference to its being changed into another state, but its then present state." Morris v. Yancey, 267 Ala. 657, 662, 104 So. 2d 553, 558 (1958). Actual possession consists of

> "such acts as would ordinarily be exercised by an owner in appropriating the land to his own use and the exclusion of others. ... And all acts of possessory nature committed by the adverse claimant are to be considered collectively rather than independently in determining the sufficiency of his possession."

Family Land & Inv. Co. v. Williams, 273 Ala. 273, 278, 138 So. 2d 696, 699 (1961). In the case of woodlands, the cutting of timber is only one factor to consider. See Rohrer v. Allen, 415 So. 2d 1054 (Ala. 1982); Kubiszyn v. Bradley, 292 Ala. 570, 575, 298 So. 2d 9, 13 (1974).

19

Maintenance of the land using good forestry-management practices is another factor. See Bergen v. Dixon, 527 So. 2d 1274, 1278 (Ala. 1988). "Marking of boundaries, taken together with other acts, may constitute possession." Hurt v. Given, 445 So. 2d 549, 552 (Ala. 1983); see also Rice v. McGinnis, 653 So. 2d 950, 950 (Ala. 1995). The leasing of the land for hunting purposes also evinces an act of possession. See Bergen, supra.

In Hurt, a landowner owned a 200-acre tract laying partially in Madison County and partially in Jackson County. Through inadvertence, the landowner failed to pay the proper taxing authorities for the 40 acres of the land that lay in Jackson County. After the 40 acres were sold at a tax sale and a tax deed was issued, the landowner commenced an action against the tax purchasers. In that action, the parties stipulated that the 40 acres were part of the 200-acre tract owned by the landowner; that the landowner owned a house on the property; that he had cut timber on the property, but not the 40 acres; and that he had annually marked the boundaries of the properties by cutting trees and painting the trees orange. In resolving whether those acts were sufficient to support a finding that the landowner had adversely possessed the 40-acre parcel, the supreme court held:

20

> "'Land need only be used by an adverse possessor in a manner consistent with its nature and character -- by such acts as would ordinarily be performed by the true owners of such land in such condition.' <u>Hand v. Stanard</u>, 392 So. 2d 1157 (Ala. 1981). <u>The specific question to be answered then is what acts would ordinarily be performed by the true owners of what the record shows to be rural, wooded land</u>."

<u>Hurt</u>, 445 So. 2d at 551 (emphasis added). The supreme court determined that the landowner had adversely possessed the entire 200-acre tract as evidenced by, among other things, the occasional cutting of timber on parts of the land and the marking of the boundaries of the land with orange paint.

In <u>Bergen</u>, a timber company owned property surrounding a rural wooded lot described as Lot 16. The timber company presented uncontroverted testimony indicating that it had "maintained good forestry management on Lot 16 since 1956, including <u>the selective cutting of timber</u>, pulpwooding (which involves the cutting of diseased or dead trees), the planting of trees, the maintaining of fire lanes, and the painting or marking of boundaries." 527 So. 2d at 1278 (emphasis added). The evidence further showed that the timber company had used painted wooden signs and painted lines to mark its territory. The timber company also had cleared part of the lot for hunting purposes. The

supreme court determined that the collective acts of possession over the requisite period supported a determination that the timber company had adversely possessed the lot. In reaching that decision, the court dismissed the argument that the timber company had not adversely possessed the lot because it had only sporadically cut timber on the property, noting that cutting timber is only one factor to be considered. Hurt and Bergen show that a timber company does not have to continuously and persistently cut timber throughout property that it claims ownership of by adverse possession to succeed in an adverse-possession claim.

In this case, Rayonier presented uncontroverted testimony from Smith indicating that, before 1999, Rayonier's predecessors in title had cordoned off the eastern part of the Hudson property to be used as part of their timbering operations. They marked a tree line as the boundary between the Rayonier property and the Hudson property with orange paint that followed an ancient fence line. The predecessors in title had used the northern part of the cordoned property to plant and maintain a pine-tree plantation. When Rayonier acquired the property, it regularly marked the tree line with blue paint and hung conspicuous boundary

signs. Rayonier managed the entire property to the tree line over the next 20-plus years. In 2012 or 2013, Rayonier harvested the pine trees, cutting trees as far south into the hardwood area as it could go. Using standard forestry-management practices, Rayonier selectively cut the timber, left the hardwood trees south of the ancient fence line standing, and replanted only in the northern part of the Hudson property. Rayonier did not harvest in the southern part of the property because it was impractical and would violate standard forestry-management practices. The foregoing evidence, along with the leasing of the land for hunting purposes, establishes that Rayonier held actual possession of the entire parcel of the claimed property because it was using the land as any owner would, considering the state of its condition.

The undisputed evidence showed that Rayonier exclusively possessed the claimed property.

> " 'Exclusivity of possession "is generally demonstrated by acts that comport with ownership." Brown v. Alabama Great Southern R.R., 544 So. 2d 926, 931 (Ala. 1989). These are "acts as would ordinarily be performed by the true owner in appropriating the land or its avails to his own use, and in preventing others from the use of it as far as reasonably practicable." Goodson v. Brothers, 111 Ala. 589, 596, 20 So. 443, 445 (1896).' "

Strickland v. Markos, 566 So. 2d 229, 235 (Ala. 1990) (quoting Sparks v. Byrd, 562 So. 2d 211, 215 (Ala. 1990)). Rayonier's actions, including the leasing of its property for hunting purposes, demonstrated the exclusivity of its possession. See Littleton v. Wells, 280 So. 3d 1080, 1088 (Ala. Civ. App. 2019) ("Leasing of the property to another certainly constitutes evidence of exclusivity of possession."). The Hudsons testified that they had not permitted Rayonier to occupy their land, but Rayonier was not a permissive user.

Rayonier also proved by undisputed evidence that it had exercised open and notorious possession of the property.

> "Open and notorious possession are essential elements of adverse possession, because the landowner is thereby afforded notice of the adverse claim against his land. Thus, to satisfy these two elements, the claimant must provide evidence tending to show that his acts of dominion and control over the property were of such character and distinction as would reasonably notify the landowner that an adverse claim is being asserted against his land. Sparks v. Byrd, 562 So. 2d 211 (Ala. 1990)."

Strickland v. Markos, 566 So. 2d 229, 235 (Ala. 1990). Smith testified that Rayonier had marked the trees so that they could easily be observed by anyone on the land. Bradley testified that the painting of the trees showed that Rayonier was claiming ownership of the eastern part of the

24

Hudson property. Ronnie testified that, from the acts of possession undertaken by Rayonier, he had understood that the company was claiming ownership rights to the Hudson property east of the tree line. See also Scott v. Anderson-Tully Co., 154 So. 3d 910, 914 (Miss. Ct. App. 2015) (holding that timber company adversely possessed property by painting blue line along old wire fence line and managing timber operations and hunting leases within the line without disruption for 40 years).

Rayonier also established by undisputed evidence that it held hostile possession of the entirety of the claimed property under a claim of right. "Possession is hostile when the possessor holds and claims property as his own, whether by mistake or willfully." Strickland, 566 So. 2d at 233. Smith testified, without contradiction, that Rayonier had not had its property surveyed when it was acquired. Rayonier followed customary timber-industry practice that treats the painted tree line established by its predecessor as the boundary line of the property. Based on that practice, Rayonier determined that its property extended to the orange painted tree line encroaching upon the Hudson property,

and it possessed and managed the property to the east of that line based on the understanding that it owned that property.

Finally, Rayonier presented uncontroverted testimony indicating that it had continuously possessed the claimed property for over 20 years. Smith testified that, beginning in 1999, Rayonier had marked the trees and that it had regularly repainted the trees every five to seven years. According to Smith, Rayonier had managed its property to the painted tree line since it acquired the property. By the time the Hudsons commenced their action, Rayonier had continuously possessed the claimed property for over 22 years.

## Conclusion

Based on the foregoing, we conclude that the trial court erred when it applied the wrong legal standard to the undisputed facts. Based on the proper standard, the trial court should have found that Rayonier had adversely possessed the entirety of the claimed property. We therefore reverse the judgment and remand the case for the trial court to conduct further proceedings consistent with this opinion, including, but not limited to, amending the judgment to adopt the boundary line advocated by Rayonier.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Fridy and Lewis, JJ., concur.

Edwards, J., concurs in the result, without opinion.